# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>     Respondent,<br><br>   v.<br><br>JULIO JOLÓN-PUAC,<br><br>     Appellant. | DIVISION ONE<br><br>No. 86165-4-I<br><br>UNPUBLISHED OPINION |

DWYER, J. — Julio Francisco Jolón Puac[1] appeals from the judgment entered on a jury verdict finding him guilty of one count of child molestation in the first degree. On appeal, Jolón contends that the trial court erred when it denied his request for a voluntary intoxication instruction. Jolón also alleges that one of the community custody provisions imposed at sentencing was unconstitutionally overbroad and vague. Finally, he contends that a victim penalty assessment (VPA) and a DNA collection fee were also improperly imposed at sentencing.

Finding no error regarding the decision to not issue a voluntary intoxication instruction, we affirm Jolón's conviction. Regarding the claim of an overbroad and vague community custody provision, the State concedes error and requests that we remand the matter to the trial court to either modify or strike the provision. We accept the concession and further authorize and direct the trial

---

[1] Jolón Puac's surname is spelled with a hyphen—"Jolón-Puac"—in the information, in the State's motions, and in the respondent's brief. However, the appellant spells his surname in the conventional Latin American form, which does not include a hyphen between family (maternal and paternal) names. Throughout this opinion, we simplify and refer to the defendant as "Jolón."

court, on remand, to reconsider the imposition of the VPA and the DNA fee in light of now existing statutory and case law and in light of the defendant's indigency, if that is established at the remand hearing.

I

In April 2022, E.C. was living in Vancouver with her older sister, Hailey Patino, her brother, A.D., and Hailey's boyfriend, Jolón. E.C. had lived in the apartment with Hailey for approximately one year. Prior to moving in with Hailey, E.C. had lived with her grandparents in Oregon City. E.C.'s sister, W.D., had also lived with Hailey during this time, but she moved out in February or March of 2022 and returned to live at their grandparents' residence. According to E.C.'s grandfather, Arturo Covarrubias, E.C.'s mother was "in and out" of the children's lives due to an alcohol problem. The family did not know the identity of E.C.'s father.

Jolón worked in a construction job. He worked in the morning and afternoon and was usually home by 4:00 p.m. Hailey was a nurse and usually left for her shifts at the hospital shortly before 6:00 p.m.

On April 15, 2022, Hailey left for work at approximately 5:30 p.m. A.D. was staying at a friend's house for the night. One or two neighbors were in the apartment with Jolón. They were all smoking marijuana and drinking alcohol in the living room. The visitors left after an hour or so, leaving only E.C. and Jolón therein.[2]

---

[2] The testimony on this was conflicting. E.C. testified that two neighbors were there and that they left the apartment for a period of time. However, Jolón testified that only one neighbor, Omar, had been there and that Omar stayed the entire evening.

2

After the neighbors left, Jolón and E.C. were sitting in the living room watching television. Jolón told E.C. that he liked her and repeatedly said that he "wanted to eat [her]." E.C. testified:

> He was telling me that I was so beautiful and that Hailey was too big for him and that he needed a smaller body to -- for him. And that he just liked -- that he liked me and that he wanted to eat me again. He said that again.

Again, according to E.C.'s testimony, Jolón told her that "it was going to be okay" and that he was not going "to do intercourse."

E.C. then began to get up from the couch in order to leave the room, but Jolón pushed her back on the couch and held her down, unbuckling her belt. E.C. testified that Jolón then put his hand inside her pants and underwear and touched her, skin to skin, over the clitoral region of her vagina.

As further elicited at trial from E.C.:

> [Prosecutor] Q. How was he holding you down? Where was he holding on your body?
> A. He was holding my left hand down because I was trying to push his hands to stop. And then he, like, grabbed both of my hands like this, and he, like, locked -- put them in a lock. But then I got -- I got out of the lock, and then I kind of just tried to, like, stop it from happening.
> And then I got off. And then I went into my -- and then I was going to my bedroom. But then he started following me. And then he was just, like, telling -- he was just calling my name and, like, stuff like that. And he was like, [E.C.]. [E.C.]. Like, come over here, please.

When E.C. reached the door to her bedroom, she tried to close it, but Jolón prevented her from doing so. Eventually Jolón relented. E.C. entered her bedroom and sent a Snapchat message to her sister, W.D., informing her of what had happened and that Jolón had touched her improperly.

3

E.C. testified that Jolón appeared to be intoxicated that evening, but she could not explain how she could determine this. E.C. had also been smoking marijuana that evening and was "kind of high," although not the "highest" she had ever been. She further testified that her marijuana use did not affect her ability to see or hear or her sense of touch. However, it "[m]aybe a little bit, if anything," affected her ability to remember what had happened that night. E.C. had gotten the marijuana from Jolón. E.C. testified that sometimes she got marijuana from Jolón, but usually she "just stole [her] sister's weed."

E.C. remained in her room for about one hour. She then left the room because she had to use the bathroom. When she walked out into the hallway and walked toward the kitchen, Jolón was there. At first, he was wearing his boxers but then he took them off and, fully naked, followed her to the kitchen. Jolón told E.C. that he wanted to talk. E.C. then moved to the living room. Jolón said to her, "can I do this?" E.C. interpreted the comment to mean that he wanted to touch her more and that he was not going to stop even if she told him to stop. E.C. then began to back up. Jolón moved toward her. E.C. testified that, at this time, Jolón's penis was "standing up" and he began to masturbate.

E.C. went into the kitchen and got a knife, returned to the living room, and told Jolón to put on his clothes. There, she saw Jolón sitting on the couch, still masturbating. At this moment, one of the neighbors came upstairs and knocked on the door. Jolón put on his boxers and answered the door. E.C. left the room and went back to her bedroom.

E.C.'s sister, W.D., testified that E.C. had sent her a message via Snapchat and that W.D. had also called and talked to E.C. In the Snapchat message, E.C. asked W.D. if they were going to pick her up because she did not want to be at the house by herself. W.D. said that E.C. was crying during the call. While talking with E.C., W.D. had the phone on speaker, and when their grandfather and uncle heard what E.C. was saying, they decided to drive to the Vancouver apartment to help her.

Hailey was the first one to arrive at the apartment. She found E.C. in her bedroom. E.C. told Hailey that Jolón had been touching her.

E.C.'s grandfather, uncle, and sister W.D. arrived approximately 30 minutes later, having driven up to Vancouver from Oregon City. As they were walking up the stairs to the Vancouver apartment, 911 was called. The call to the 911 dispatcher reported that "the boyfriend of the reporting party's older sister touched a younger sister, 12 years old, in a sexual way." This information was provided to the police officers who responded to the call.

Upon entry to the apartment, E.C.'s grandfather and uncle proceeded to hit Jolón and pinned him to the ground. Officers from the Vancouver Police Department arrived soon afterward and were able to break up the physical altercation. Officer Christian Stromme testified that Jolón's demeanor was initially grateful, but that he became confrontational when he was being taken into custody. Nine or ten officers were present at the scene, including four officers who testified at trial. Several of the officers interviewed E.C., Jolón, and

Hailey. The officers took photographs of the living room, including the empty beer cans.

At approximately 1:00 a.m., E.C. went to the hospital with her grandfather and W.D. They went to the hospital in order for E.C. to be examined, but they left before she saw a doctor because it was very late and they were all tired. E.C. testified that she also felt too uncomfortable to remain.

At trial, E.C. testified about what happened on April 15. She also testified that there had been two previous incidents when Jolón had expressed his interest in touching or "eating" her.

Jolón had moved into Hailey's apartment in March of 2022. At trial, E.C. did not remember the exact date of the first time Jolón improperly touched her, but she knew she was then 11 years old.[3] E.C. testified that she had been sitting on a couch in the living room watching television. Jolón was also watching television, sitting on a different couch. On this particular occasion, her sister and brother were in the apartment, but they were in their respective bedrooms and not in the room with E.C. and Jolón. Jolón told E.C. that he wanted her, and he moved so as to be able to touch her legs with his hands, rubbing against her ankles and then moving further up to her thighs. "He told me he that he wanted to eat me and that -- yeah, he just wanted to eat me and that he liked me," according to E.C. Jolón then got up from the couch where he was sitting and started to crawl toward E.C. E.C. felt uncomfortable and left the room.

When the State asked E.C. if she knew what "eat" meant, she answered:

---

[3] E.C. also described the previous interactions with Jolón in detail during a pretrial interview on August 1, 2022.

A. Like, I don't know. I don't know -- I don't -- well, I do know how to explain it. Like, when you're giving somebody head.

Q. Okay. So something sexual in nature?

A. Yeah.

Q. Can you describe what that is in your own words the best you can.

A. When you lick someone's private part.

E.C. further testified that the second incident with Jolón occurred two or three days later, before school, while Hailey was in the kitchen and W.D. and A.D. were upstairs in their bedrooms. E.C. was sitting on the couch waiting for Hailey to finish making breakfast. Jolón sat down next to her. He took her arm and kissed it, and told her not to tell anybody. E.C. left and went up to her bedroom. The encounter made her feel uncomfortable and frightened.

E.C. told her sister, W.D., about both of these incidents. She did not directly tell her older sister, Hailey, but a week after the second incident, Hailey asked E.C. about it and inquired if E.C. was "okay." E.C. testified about this conversation with Hailey:

And then [Hailey] told me that Francisco had told her that he touched me. And then she just wanted to make sure that I was okay, and she wanted to know what happened. And then I didn't -- I -- she changed the subject after -- before I even got to tell her so --

In response to the prosecutor's questions, E.C. continued:

A. I told her that I was okay and just like -- you know, like, when is he [Jolón] going to move out and stuff. And we were just talking about things like that. And then after we went home. That was it.

Q. Did you think he was going to be moving out?

A. Maybe. I was -- I thought that maybe, if anything, he'd move out in, like, a couple weeks but --

7

At trial, Officers Chylah Bass, Christian Stromme, Nicholas Giolingham, and Gunnar Skollingsberg testified about the presence of alcohol and marijuana at the scene, Jolón's apparent level of intoxication, E.C.'s demeanor during her interview, and her statement to an officer that she had been sexually abused.

Officer Skollingsberg interviewed E.C. at the apartment. He testified that "[E.C.'s] responses were rather short and very to the point and very quick, and she appeared to be uncomfortable and slightly defensive." Officer Giolingham testified that E.C. disclosed to him that she believed she had been sexually abused. The officer described E.C.'s demeanor as calm, "not a lot of emotion."

On direct examination, Officer Stromme was asked about Jolón: "[D]uring your interaction with the defendant, did he appear to be intoxicated?" Officer Stromme answered "Yes, ma'am." The officer stated that Jolón's intoxication level was "obvious" because of Jolón's slurred speech, difficulty maintaining balance, and the officer smelled an odor of intoxicants on his breath. The prosecutor then asked if Officer Stromme could determine whether Jolón was coherent and understood his instructions, to which the officer answered, yes, that Jolón was coherent and able to understand his instructions "with the assistance of an interpreter sometimes."

Officer Skollingsberg also testified about Jolón's level of intoxication and coherence.

> A. When I saw and spoke with him, there were several things. His eyes were watery. They were red, bloodshot. There was a very, very strong odor of intoxicants coming from his person specifically when he would speak. His responses were appropriate, he was alert; however, they were delayed and repetitive sometimes. And his speech was slurred.

8

Q. At what level did you believe the defendant was intoxicated?

A. Beyond the level I would be comfortable with him driving. Well beyond that.

Q. Was the defendant coherent?

A. Yes.

Q. Did he understand instructions?

A. Yes, he did.

Q. Was he able to respond appropriately?

A. Yes.

Jolón testified, speaking in Spanish, but with the aid of an interpreter. Jolón testified that there had been a misunderstanding and that E.C. had not correctly understood what he was saying to her in Spanish. Jolón stated that he had actually asked E.C. if she was hungry and wanted some food to eat, but E.C. did not speak Spanish well and, therefore, she wrongly thought Jolón had said "I want to eat you."[4]

Jolón denied touching E.C.'s legs. He denied walking naked inside the apartment in front of E.C. He denied that he had been masturbating in front of her.

Jolón testified that he and his friend, Omar, had been smoking marijuana and drinking beer the entire evening, and that Omar had not left the apartment. Jolón claimed that he had only consumed about three beers and that Omar had also consumed three or four beers. The prosecutor pointed out that there were fifteen beer cans in the photograph of the living room in the apartment. In response, Jolón testified that there had already been empty beer cans in the box that Omar brought over to share with Jolón. Jolón testified that they had

---

[4] At trial, E.C. testified that she spoke and understood Spanish and that people in her family spoke Spanish to her, although she was not a fluent speaker herself. She also testified that during the April 15 incident, Jolón was speaking to her in English.

consumed the beer and smoked over a period of three hours while they were watching television and listening to music. Jolón claimed that although he had been drinking, he was not intoxicated:

> Q. Okay. So would you say that you were intoxicated or not intoxicated when Hailey came home?
> A. No, I don't think anybody was intoxicated.
> . . . .
> Q. And would you say you were intoxicated, or were you not intoxicated when the police officers arrived that evening and spoke with you and had contact with you?
> A. I did feel the effects of the marijuana and that I had been drinking, but I was more like in pain because of the beating -- for the fight in the apartment.
> Q. Okay. But that's not my question. My question was do you feel you were intoxicated or not intoxicated when the police arrived later that evening, contact you, and talk to you?
> A. I did not consider I was intoxicated, but I had been drinking.

W.D. testified that she had told Hailey about Jolón touching E.C. two and a half weeks before the April 15, 2022 incident. W.D. confirmed that E.C. sent her Snapchat messages on April 15 and had also told her about similar interactions with Jolón on previous dates.

After both parties rested and the jury departed the courtroom, the trial court met with the attorneys to discuss the court's proposed jury instructions. Regarding the defense's proposed instruction on sexual contact and voluntary intoxication, the court stated:

> Instruction No. 7 is the definition of sexual contact.
> Originally the Court was going to insert the defendant's proposed instruction as instruction No. 8 after the definition of sexual contact on voluntary intoxication, and we can talk about that, *but it did not appear to me that the defendant through his testimony or the presentation of evidence was asserting voluntary intoxication, so I left that out of the final packet* that I have here.

10

(Emphasis added.)

Defense counsel then repeated the request he initially made during motions in limine for the court to include the proposed voluntary intoxication instruction in its instructions to the jury.

> MR. SOWDER:  I would still request the voluntary instruction -- the voluntary intoxication instruction.  I think there's sufficient evidence to indicate from what the officer is saying he was obviously intoxicated, the alleged victim saying he was super high, super drunk despite his -- the pictures of the beer cans despite his statements that he didn't drink that much.  It's something the jury can consider -- should consider.
>
> THE COURT:  All right.  So I guess you're indicating that there's evidence sufficient that the defendant at the time that he committed an act, which he says he did not commit, was so intoxicated that he would be unable to form the intent.  What specific information would allow a jury to make that finding -- or to consider that?
>
> MR. SOWDER:  Because I think even if defendants say they're not intoxicated, there's other evidence that they are intoxicated that could be something that the jury could consider.
>
> THE COURT:  Well, the test isn't whether you're intoxicated. It's whether you're intoxicated to the point that you can't form the specific intent that goes with the act that you're supposed to be committing.  So what witness testified that he was in that mental state?
>
> MR. SOWDER:  All we have is the two witnesses that he was obviously intoxicated, and he was super high or super drunk. And the instruction I believe from WPIC 18.10[5] – I'll just read the one I'm requesting.  No act committed by a person while in a state of voluntary intoxication is less criminal by the reason of that condition; however, in determining if the defendant acted for the purpose of gratify the sexual desire of either party, evidence of intoxication may be considered.  And I cited State versus Stevens 127 Wn. App 269 (2005).
>
> THE COURT:  Did you wish to be heard on this point?

---

[5] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 18.10 (5th ed. 2021).

MS. MEYER: Your Honor, the State does not believe there's substantial evidence based on any of the testimony that the defendant was [a]ffected to the point necessary to get this instruction. The defendant himself based on his testimony was not. The officers also testified that the defendant was coherent, understood them, and was able to respond appropriately.

THE COURT: Well, it's an interesting position because it's technically correct that it's – it's not illegal -- usually isn't found to be very smart, but it's not illegal to argue inconsistent defenses. In other words, you get up in front of the jury and argue I didn't -- for example, I didn't hit the guy, but if I hit him, it was in self-defense. That almost universally guarantees that the jury isn't going to buy either one of your arguments. But it's permissible to make that argument when the evidence supports it.

However I find here that the evidence does not support it. Although there was evidence that the defendant was intoxicated, the State's witnesses indicate that while he was intoxicated, he was coherent and able to follow instructions. That he while exhibiting signs of intoxication that were obvious; however, there was no indication that he was at the point where he couldn't have formed the intent necessary for sexual desires.

Certainly none of the lay witnesses testified to that. And the defendant in his testimony not only denied the act but denied that he was intoxicated. So there's simply no basis for me to throw in this instruction that no witness testified to allow the jury to speculate on it. So your section -- your objection is noted -- exception is noted.

Accordingly, the trial court instructed the jury without including an instruction on voluntary intoxication. Three instructions are particularly pertinent to our analysis.

A person commits the crime of Child Molestation in the First Degree when the person has sexual contact with a child who is less than twelve years old and who is at least thirty-six months younger than the person.

Instruction 5.

To convict the defendant of the crime of Child Molestation in the First Degree, each of the following elements of the crime must be proved beyond a reasonable doubt:

12

(1) That on or about or between January 1, 2022 and April 16, 2022, the defendant had sexual contact with E.C.;

(2) That E.C. was less than twelve years old at the time of the sexual contact;

(3) That E.C. was at least thirty-six months younger than the defendant; and,

(4) That this act occurred in the state of Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

Instruction 6.

Sexual contact means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desires of either party.

Instruction 7.

Upon concluding its deliberations, the jury found Jolón guilty of the crime of child molestation in the first degree.

Jolón subsequently moved for a new trial or, in the alternative, for an arrested judgment. Defense counsel argued that the trial court erred by not instructing the jury as to the defense of voluntary intoxication. Defense counsel also asserted that insufficient evidence of child molestation in the first degree was adduced at trial, based on the assertion that E.C. had testified that the illegal act was just a "two second touch."

The State responded that the trial court had property denied Jolón's oral motion to dismiss after the close of the State's case, and that the jury had been presented with sufficient evidence to warrant the conviction. The State further

13

argued that the necessary proof to establish sexual contact did not contain a duration requirement.

The trial court denied Jolón's motion for a new trial or an arrested judgment.

On September 30, 2022, Jolón was sentenced to a minimum term of 60 months of incarceration with a maximum of life. He appeals.

II

Jolón first contends that he was improperly prevented from presenting his theory of the case to the jury. This is so, he asserts, because the trial court wrongly refused to give the jury an instruction on the defense of voluntary intoxication. We disagree.

A

Our standard of review is dependent on whether the trial court's refusal to give the requested instruction was based on the evidence presented or on a ruling of law.

> A trial court's refusal to give a requested instruction, when based on the facts of the case, is a matter of discretion and will not be disturbed on review except upon a clear showing of abuse of discretion. State ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). See Grant v. Huschke, 70 Wash. 174, 177, 126 P. 416 (1912), overruled on other grounds by Larson v. City of Seattle, 25 Wn.2d 291, 171 P.2d 212 (1946). When . . . a trial court's decision regarding a jury instruction is "predicated upon rulings as to the law," however, it is reviewed de novo for error of law. Braden v. Rees, 5 Wn. App. 106, 110, 485 P.2d 995 (quoting Johnson v. Howard, 45 Wn.2d 433, 436, 275 P.2d 736 (1954) (citing Huschke, 70 Wash. 174, 126 P. 416)), review denied, 79 Wn.2d 1009 (1971).

State v. Lucky, 128 Wn.2d 727, 731, 912 P.2d 483 (1996), overruled on other grounds by State v. Berlin, 133 Wn.2d 541, 544, 947 P.2d 700 (1997).

Here, the proposed instruction contained language consistent with the pertinent statute, which provided:

> No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his or her condition, but whenever the actual existence of any particular mental state is a necessary element to constitute a particular species or degree of crime, the fact of his or her intoxication may be taken into consideration in determining such mental state.

RCW 9A.16.090. The trial court's decision was not based on a rule of law. Instead, as set forth previously, the trial court's ruling was based on its analysis of the evidence presented. Accordingly, our review is for abuse of discretion.

B

Before reviewing the appropriateness of a voluntary intoxication instruction, we must first outline the elements of the crime of child molestation, specifically the required mental state of the charged offense.

To convict a person of child molestation in the first degree, as charged herein, a jury must find beyond a reasonable doubt that a person of a certain age had "sexual contact" with a child of a certain age. RCW 9A.44.083 (which prohibits a person from having "sexual contact with another [person] who is less than twelve years old" when the first person is at least 36 months older). "Sexual contact" is defined as "any touching of the sexual or other intimate parts of a person done for the *purpose of gratifying sexual desire* of either party or a third party." RCW 9A.44.010(13) (emphasis added). Thus, the State had the burden

of proving that Jolón acted with the purpose of gratifying his sexual desire when he touched E.C.  This was the mental state at issue.

The "purpose of sexual gratification" is not an essential element of first degree child molestation.  However, it is a definitional term used to clarify the essential element of "sexual contact."  State v. Stevens, 158 Wn.2d 304, 309, 143 P.3d 817 (2006).[6]

Here, E.C. was less than 12 years old and Jolón was more than 36 months older than E.C. on the date of the alleged offense.  Sexual contact occurred when Jolón pushed his hand under E.C.'s pants and touched E.C.'s vagina with his fingers.  The question that remains, therefore, is whether Jolón touched her vagina with his fingers for the purpose of gratifying his sexual desire.

The record provides sufficient evidence to prove that Jolón approached E.C. on a least three separate occasions, between March and April 2022, with the purpose of satisfying his sexual desires.  At trial, E.C. testified about these three incidents and described Jolón's verbal and physical invitations to E.C. to engage sexually with him.  Jolón told E.C. repeatedly that he liked her and wanted to "eat" her.  Jolón touched her leg and thigh and kissed her arm while telling her these things.  The first two incidents occurred during the daytime, when there was no testimony that Jolón was intoxicated or that he had been

---

[6] Stevens cites to an earlier opinion, State v. Lorenz, 152 Wn.2d 22, 93 P.3d 133 (2004), which explains: "Had the legislature intended a term to serve as an element of the crime, it would have placed 'for the purposes of sexual gratification' in RCW 9A.44.083.  Rather the definition of 'sexual contact' clarifies the meaning such that it excludes inadvertent touching or contact from being a crime.  A plain reading of the statute favors a holding that 'sexual gratification' is not an essential element to the crime of first degree child molestation but a definition clarifying the meaning of the essential element 'sexual contact.'"  Lorenz, 152 Wn.2d at 34-35 (citations omitted).

drinking. Then, on the evening of April 15, Jolón presented himself to E.C. while naked, his penis was erect, and he proceeded to masturbate in front of her, tending to demonstrate that the prior contact (that formed the basis for the charge) was not accidental and that his intoxication did not affect his ability to purposely act to satisfy his sexual desires. The record provides sufficient evidence that Jolón appeared to have the required mental state to be guilty of the crime of child molestation.

Accordingly, we next proceed to examine if evidence was produced that tended to demonstrate that Jolón was intoxicated to such an extent that he was likely not able to form this mental state. If not, the trial court properly declined to issue a voluntary intoxication instruction to the jury.

C

A defendant is entitled to have the jury instructed on the defendant's theory of the case only when the proposed instruction is a correct statement of the law, the theory of the defense has support in the evidence admitted, and the instruction does not mislead the jury. Stevens, 158 Wn.2d at 308, 310 (citing State v. Barnes, 153 Wn.2d 378, 382, 103 P.3d 1219 (2005)).

Voluntary intoxication is not a defense to a crime. State v. Coates, 107 Wn.2d 882, 891, 735 P.2d 64 (1987). Rather, the defense of voluntary intoxication asks the jury to consider evidence of the defendant's intoxication in determining whether the defendant acted with the mental state required to commit the crime charged. State v. Thomas, 123 Wn. App. 771, 781, 98 P.3d

17

1258 (2004). For the trial court to be required to issue a voluntary intoxication instruction, the defendant must establish that

> (1) the crime charged has as an element a particular mental state, (2) there is substantial evidence of drinking, and (3) evidence that the drinking affected the defendant's ability to acquire the required mental state. E.g., State v. Gallegos, 65 Wn. App. 230, 238, 828 P.2d 37, review denied, 119 Wn.2d 1024, 838 P.2d 690 (1992). Put another way, the evidence must reasonably and logically connect the defendant's intoxication with the asserted inability to form the required level of culpability to commit the crime charged. State v. Griffin, 100 Wn.2d 417, 418-19, 670 P.2d 265 (1983). Evidence of drinking alone is insufficient to warrant the instruction; instead, there must be "substantial evidence of the effects of the alcohol on the defendant's mind or body." Safeco Ins. Co. v. McGrath, 63 Wn. App. 170, 179, 817 P.2d 861 (1991), review denied, 118 Wn.2d 1010, 824 P.2d 490 (1992).

State v. Gabryschak, 83 Wn. App. 249, 252-53, 921 P.2d 549 (1996).

Herein, the trial court refused to issue Jolón's proposed voluntary intoxication instruction.

The record supports the conclusion that while the evidence satisfied the first two criteria set forth in Gabryschak (crime charged has element of particular mental state and there was substantial evidence of drinking), the evidence did not satisfy the third part of the test (intoxication affected defendant's ability to attain the mental state for the crime). There was no evidence presented at trial "that he otherwise exhibited sufficient effects of the alcohol from which a rational juror could logically and reasonably conclude that his intoxication affected his ability to think and act in accord with the requisite mental states." Gabryschak, 83 Wn. App. at 255. Indeed, the only evidence admitted on the question, as set forth above, was evidence in support of the proposition that Jolón had the ability to form the required mental state at the time of the offense.

18

During the September 30, 2022 sentencing hearing, and in response to Jolón's September 6, 2022 motion for new trial, the trial court was consistent when explaining its reasoning, once again, for denying the voluntary intoxication instruction. When ruling on Jolón's posttrial motion, the court explained, in pertinent part:

> On the question of the voluntary intoxication instruction, while it's true that the defendant can present inconsistent defenses and argue or not argue them to the jury in their closing, the test for the introduction of a voluntary intoxication instruction is it's *not sufficient simply that the person voluntary consumed something which might intoxicate them or that they were intoxicated. There has to be evidence from which a jury might be able to find that the defendant at the time was so affected by intoxication that they were unable to form a mental state* that had something to do with the case.
> There was simply no evidence from which the jury could have made that finding, and no party expressly testified to that -- or no witness, excuse me, expressly testified that the defendant was in such a state or that they believed he was in such a state.

(Emphasis added.)

The trial court's reasoning is supported by case law and the evidentiary record. While the evidence was undisputed that Jolón had been drinking and smoking marijuana on the night that he had physical contact with E.C., other evidence indicated that he did not consider himself intoxicated, that he interacted coherently with police officers at the time, and that he understood and responded to their questions. Jolón also directly testified that he was not intoxicated. As Gabryschak notes, "[i]ntoxication is not an all-or-nothing proposition. A person can be intoxicated and still be able to form the requisite mental state, or he can be so intoxicated as to be unconscious." 83 Wn. App. at 254. As the trial judge

19

noted, the evidentiary record herein is devoid of evidence or testimony that Jolón was intoxicated to a degree that he could not form the requisite mental state.

The trial judge properly reserved the request for the voluntary intoxication instruction at the beginning of the trial. Then, after hearing the evidence and after the parties rested, the court cogently provided its reasoning for denying the instruction. Under these circumstances, the trial court did not abuse its discretion.

III

Next, Jolón contends that a community custody condition imposed on him is unconstitutionally overbroad and vague. The State concedes that this is so, confesses error, and requests a remand to the trial court for it to either modify or strike the provision. We accept the State's concession.

The condition at issue is:

> You shall not possess, use, access, or view any sexually explicit material as defined by RCW 9.68.130(2) or erotic materials as defined by RCW 9.68.050(2) or *any material depicting any person engaged in sexually explicit conduct* as defined by RCW 9.68A.011(4) unless given prior approval by [Department of Corrections] and your sexual deviancy treatment provider.

(Emphasis added.)

In its concession, the State cites to an unpublished opinion, State v. Soungpanya, No. 54455-5-II (Wash. Ct. App. Nov. 9, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2054455-5-II%20Unpublished%20Opinion.pdf, in which it previously conceded error on the same issue. In its holding, regarding the "prohibition on accessing any material depicting sexually explicit conduct," the Soungpanya opinion cites to State v.

Padilla, 190 Wn.2d 672, 682, 416 P.3d 712 (2018). Our Supreme Court in Padilla concluded that a prohibition on viewing "pornographic materials" was unconstitutionally vague because it would "unnecessarily encompass movies and television shows not created for the sole purpose of sexual gratification." Padilla, 190 Wn.2d at 681.

We remand to the trial court to conduct a hearing after which it may either modify or strike the provision.

IV

Finally, Jolón brings a motion outside his briefing, seeking to have us strike the VPA and DNA fees imposed on him. He cites to Engrossed Substitute House Bill (ESHB) 1169 (adopted as LAWS OF 2023, ch. 449) and State v. Ellis, 27 Wn. App. 2d 1, 530 P.3d 1048 (2023). The trial court ordered Jolón to pay a $500 victim assessment pursuant to RCW 7.68.035 and a $100 DNA collection fee pursuant to RCW 43.43.7541.

Because we are remanding this matter for a hearing on the condition of community custody addressed previously, we authorize and direct the trial court to address the questions of fee obligations and indigency at the same hearing.

V

We affirm the conviction.

We remand for hearing and determination of the questions concerning the community custody condition, the VPA, and the DNA collection fee.

Affirmed in part and remanded.

Dwyer, J.

WE CONCUR:

Díaz, J.                    Chung, J.